**Affirmed; Opinion Filed February 12, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

## No. 05-17-00181-CV

**BAYLOR UNIVERSITY MEDICAL CENTER, INC., BAYLOR SCOTT & WHITE HEALTH; BSW HEALTH SERVICES AND WILLIAM P. SHUTZE, M.D., Appellants**

**V.**

**BAHRAUM DANIEL DANESHFAR, M.D., Appellee**

On Appeal from the 191st Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-15-11793-J

## MEMORANDUM OPINION ON MOTION FOR REHEARING

Before Justices Francis, Myers, and Whitehill
Opinion by Justice Myers

We deny the motion for rehearing. We withdraw the memorandum opinion and vacate the judgment of November 7, 2017. The following is now the opinion of this Court.

This case concerns whether a medical resident who is terminated from a hospital's fellowship residency program and brings suit for various causes of action, including breach of contract and wrongful termination, is subject to the expert-report requirement of the Texas Medical Liability Act, section 74.351 of the Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (West 2017). Baylor University Medical Center, Inc., Baylor Scott & White Health, BSW Health Services, (collectively "Baylor") and William P. Shutze, M.D. appeal the trial court's denial of their motion to dismiss the suit brought by Bahraum Daniel Daneshfar,

M.D. under section 74.351 because Daneshfar failed to serve an expert report. We affirm the trial court's order denying the motion to dismiss.

## BACKGROUND[1]

In June 2013, Daneshfar entered into a fellowship residency program at Baylor to study vascular surgery. The hospital placed Daneshfar under the tutelage of Shutze, the director of the residency program. As part of the program, Shutze was supposed to give Daneshfar a review every six months. However, Shutze did not perform the review until April 2014 despite Daneshfar's repeated requests for the review. At that first review, Shutze told Daneshfar he personally did not like him and did not respect him as a medical associate. Shutze also refused Daneshfar permission to take vacation time near the date of the board exams, and Shutze required Daneshfar to work more shifts and on-call periods than other residents during the period near the exams.

In December 2014, Daneshfar asked Shutze to give him the required review, but Shutze refused. Shutze also berated and belittled Daneshfar in front of others and repeatedly threatened to fire Daneshfar if he complained about Shutze's behavior to the Graduate Medical Education Office.

In January 2015, Daneshfar requested a meeting with Dr. William Sutker, Baylor's Designated Institutional Officer for the Graduate Medical Education Office, to air his grievances with the residency program and Shutze. However, at the meeting, which Shutze also attended, Daneshfar was not allowed to air his grievances and was told he was on a sixty-day formal probation because of unsatisfactory performance. After the meeting, Shutze told Daneshfar there was nothing he could do to get off probation. Shutze refused to meet further with Daneshfar despite the requirements of Daneshfar's contract with Baylor and the requirements of the Graduate Medical Education program.

---

[1] The factual statements are drawn from Daneshfar's first amended petition, which was his live pleading at the time of the motion to dismiss.

Daneshfar retained an attorney who sent a letter to Baylor outlining Daneshfar's conflicts with Shutze and his problems with the residency program. Daneshfar also sent Baylor a complaint that he stated he would submit to the Accreditation Council for Graduate Medical Education, which oversees and certifies post-graduate medical education programs, including Baylor's residency programs. The next day, Baylor terminated Daneshfar from the residency program. Daneshfar followed Baylor's internal review process, but he was not reinstated. Daneshfar was told the internal review process was limited to the question of his competency and that he would not be able "to discuss duty hours, Dr. Shutze, or other issues unrelated to the question of your competency."

Daneshfar sued Baylor and Shutze for breach of contract, negligence, wrongful discharge, breach of fiduciary duty, assisting or encouraging a breach of fiduciary duty, conspiracy to breach a fiduciary duty, negligent supervision, tortious interference with contract, duress, and intentional infliction of emotional distress. Eight months later, Baylor and Shutze filed a motion to dismiss Daneshfar's claims asserting they were health care liability claims and that Daneshfar did not serve them with an expert report as required by section 74.351 of the Act. *See* CIV. PRAC. § 74.351(a), (b). The trial court held a hearing on the motion to dismiss and denied it. Baylor and Shutze now bring this interlocutory appeal contending the trial court erred by denying their motion to dismiss. *See* CIV. PRAC. § 51.014(a)(9).

## STANDARD OF REVIEW

In their sole issue on appeal, appellants contend the trial court erred by denying their motion to dismiss because Daneshfar's claims are health care liability claims requiring him to serve appellants with expert reports, which he failed to do.

This case requires the interpretation of statutes. When construing statutes, we attempt to ascertain and effectuate the legislature's intent. *City of San Antonio v. City of Boerne*, 111 S.W.3d

22, 25 (Tex. 2003). We start with the plain and ordinary meaning of the statute's words. *Id.* If a statute is unambiguous, we generally enforce it according to its plain meaning. *Id.* We read the statute as a whole and interpret it so as to give effect to every part. *Id.*; *see also Phillips v. Bramlett*, 288 S.W.3d 876, 880 (Tex. 2009) ("We further try to give effect to all the words of a statute, treating none of its language as surplusage when reasonably possible."). We apply a de novo standard of review to the trial court's interpretation of statutes. *Levinson Alcoser Assocs., L.P. v. El Pistolon II, Ltd.*, 513 S.W.3d 487, 493 (Tex. 2017).

We review a trial court's decision on a motion to dismiss under section 74.351 for an abuse of discretion. Whether a cause of action is a health care liability claim is a question of law. *Dual D Healthcare Operations, Inc. v. Kenyon*, 291 S.W.3d 486, 488 (Tex. App.—Dallas 2009, no pet.); *see Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010) (explaining principles of statutory construction).

### THE EXPERT-REPORT REQUIREMENT OF § 74.351

Section 74.351 of the Act provides, "In a health care liability claim, a claimant shall . . . serve on [each defendant or the defendant's attorney] one or more expert reports . . . for each physician or health care provider against whom a liability claim is asserted." CIV. PRAC. § 74.351(a). The expert report must be served within 120 days after the defendant files its answer. *Id.* If the expert report is not timely served, then, on motion of the affected physician or health care provider, the trial court must dismiss the claim with prejudice to refiling and award the physician or health care provider its costs and attorney's fees. *Id.* § 74.351(b). In this case, Daneshfar did not serve Baylor or Shutze with expert reports after filing his claims against them.

Under the Act, a "claimant" is "a person . . . seeking or who has sought recovery of damages in a health care liability claim." Daneshfar is a person seeking recovery of damages. Whether he

–4–

is a claimant, and therefore subject to the expert-report requirement of section 74.351(a), depends on whether his claims are "health care liability claims."

## HEALTH CARE LIABILITY CLAIM

Appellants assert Daneshfar's claims are health care liability claims as defined by section 74.001. "Health care liability claim" is defined as:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

CIV. PRAC. § 74.001(a)(13) (West 2017).

To determine whether a cause of action is a health care liability claim, we examine the underlying nature of the claim. *Marks*, 319 S.W.3d at 664 (citing *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 543 (Tex. 2004)); *Dual D Healthcare Operations, Inc.*, 291 S.W.3d at 489. We focus on the essence of the claim and consider the alleged wrongful conduct and the duties allegedly breached. *See Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 851 (Tex. 2005). When the essence of the suit is a health care liability claim, a party cannot avoid the requirements of the statute through artful pleading. *Garland Cmty. Hosp.*, 156 S.W.3d at 543; *see Yamada v. Friend*, 335 S.W.3d 192, 194–95, 196–97, 197–98 (Tex. 2010) (unchallenged holding that claims encompassing physician's safety advice to water park were health care liability claims required dismissal of all claims arising from same facts on theory of improper claim-splitting).

### Professional or Administrative Services

Appellants first contend that Daneshfar's causes of action are health care liability claims because they are "for . . . claimed departure from accepted standards of professional or administrative services directly related to health care." CIV. PRAC. § 74.001(a)(13).

The Act defines "Professional or administrative services" as meaning "those duties or services that a physician or health care provider is required to provide as a condition of maintaining the physician's or health care provider's license, accreditation status, or certification to participate in state or federal health care programs." *Id.* § 74.001(a)(24). To be a health care liability claim, the cause of action for a claimed departure from accepted standards of professional or administrative services must be "directly related to health care." *See id.* § 74.001(a)(13) (definition of "health care liability claim"); *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 185 (Tex. 2012). The Act defines "health care" as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment or confinement." CIV. PRAC. § 74.001(a)(10). "Medical care" is defined as "any act defined as practicing medicine under Section 151.002, Occupations Code, performed or furnished, or which should have been performed, by [a physician] for, to, or on behalf of a patient during the patient's care, treatment, or confinement." *Id.* § 74.001(a)(19). Section 151.002 of the Occupations Code defines "practicing medicine" as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions . . . ." TEX. OCC. CODE ANN. § 151.002(13) (West Supp. 2017). "Treatment" and "confinement" are not defined by the Act; therefore, they "shall have such meaning as is consistent with the common law." CIV. PRAC. § 74.001(b).

Thus, for Daneshfar's causes of action to be health care liability claims for professional or administrative services, they must be against a physician or health care provider for a departure from duties or services required for appellants to maintain their licenses, accreditation, or certifications *and* be directly related to acts or treatments performed or that should have been performed by a health care provider for, to, or on behalf of a patient during the patient's medical

care, treatment, or confinement. We examine Daneshfar's claims and determine whether they fit this description. *See Marks*, 319 S.W.3d at 664; *Diversicare Gen. Partner*, 185 S.W.3d at 851.

Many of Daneshfar's claims allege violations of requirements of the Accreditation Council for Graduate Medical Education (ACGME). The ACGME is the organization that accredits and oversees medical residency programs. It imposes requirements on the programs to obtain and retain accreditation. It obtains information about existing programs and grants them the status of "Continued Accreditation" if the program substantially complies with the ACGME's requirements. If a program violates the ACGME's requirements, the program may receive a warning or be placed on probation. If the violations are not cured, then the ACGME may withdraw its accreditation of the program. Baylor's vascular-surgery residency program was ACGME accredited before Daneshfar was a resident, and it has maintained its status of Continued Accreditation.

Before turning to Daneshfar's allegations, we first address appellants' argument that because all of Daneshfar's claims involve his training to be a vascular surgeon, they all involve the practice of medicine. In support of this argument, appellants rely on section 74.401(b) of the Act, which states, "For the purposes of this section, 'practicing medicine' or 'medical practice' includes, but is not limited to, training residents or students at an accredited school of medicine . . . ." Civ. Prac. § 74.401(b). However, as the first phrase makes clear, the definition does not apply outside of section 74.401, which concerns the qualifications of expert witnesses in suits against physicians. *See id.* § 74.401. By its own terms, the definition of "practicing medicine" in section 74.401(b) does not apply to the definition of a health care liability claim in section 74.001. Applying that definition outside section 74.401 would violate the clear intention of the legislature. Instead, "medical care" and "practicing medicine" in the statutes applicable to this case mean "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder

–7–

or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions . . . ." OCC. § 151.002(13); *see* CIV. PRAC. § 74.001(a)(19) (incorporating the definition of "practicing medicine" in the Occupations Code into the definition of "medical care"). The training of a resident, such as Daneshfar, constitutes practicing medicine or medical care by the training physician and health care provider only if their actions meet this definition.

Daneshfar alleged Baylor failed to "use reasonable efforts to provide a suitable environment for medical education experience." To that end, Daneshfar alleged, he "was forced to endure harassment, berating and belittling at the hands of Baylor's Program Director, Shutze, and Baylor's internal administrative review process." This obligation is a requirement for an institution to maintain its accreditation with the ACGME. Although his allegation concerns Baylor's duties to maintain its ACGME accreditation, nothing in the record shows that Shutze's verbal abuse and other harassment was directly related to health care, i.e., any act or treatment for the medical care, treatment, or confinement of a patient. Therefore, these facts do not raise a health care liability claim.

Daneshfar also alleged Baylor breached its promise that "[t]he evaluation of Resident Physician will be made on a regular basis, according to ACGME guidelines." Those guidelines required that the residency program "provide each resident with documented semiannual evaluation of performance with feedback." Daneshfar alleged that Baylor, through Shutze's inaction, failed to comply with this requirement. Although this allegation concerns Baylor's duties to maintain its accreditation, the record does not show Shutze's failure to provide the required reviews directly related to any act or treatment for the medical care, treatment, or confinement of a patient. Therefore, these facts do not raise a health care liability claim.

Daneshfar also alleged Baylor and Shutze retaliated against him for making a report to and seeking a meeting with Dr. William Sutker, Baylor's Designated Institutional Official for the

Graduate Medical Education Office, for Daneshfar to air his grievances about Shutze and the program. When the meeting occurred, Shutze was present, and Daneshfar was not allowed to talk about his problems with Shutze and the program. Instead, he was told he was on a formal, sixty-day probation. Daneshfar alleged this formal probation was retribution for his attempt to complain to Sutker. Daneshfar also alleged Baylor retaliated against him by terminating him from the residency program because he hired a lawyer who drafted a complaint to the ACGME about Daneshfar's conflicts with Shutze and his problems with the program. The ACGME requires that a sponsoring institution (such as Baylor) and its residency programs, "provide a learning and working environment in which residents/fellows have the opportunity to raise concerns and provide feedback without intimidation or retaliation and in a confidential manner as appropriate." Daneshfar's allegation concerns Baylor's duties or services it was required to provide as a condition of maintaining the accreditation of its residency program. However, nothing in the record shows this violation was directly related to any act or treatment for the medical care, treatment, or confinement of a patient. Therefore, these facts do not raise a health care liability claim.

Daneshfar also alleged Baylor's internal review process was a sham because he was limited in the appeals to discussing his competency and was prohibited from discussing his conflicts with Shutze and his problems with the residency program. He also alleged the review process was a sham because it "was tainted by the influence, directly and indirectly, of Shutze and others closely aligned personally and/or professionally with him." Daneshfar also alleged he was not allowed to copy his personal file and that it "was subsequently altered and changed by Shutze and/or others." Assuming these facts, if true, constitute violations of ACGME requirements for accreditation of Baylor's residency program, the record does not show they directly relate to any act or treatment

–9–

for the medical care, treatment, or confinement of a patient. Therefore, they do not raise a health care liability claim.

Daneshfar also alleged Baylor failed to monitor Shutze and the residency program to prevent Shutze's actions and Daneshfar's injuries. However, the record does not show that the lack of monitoring directly related to any act or treatment for the medical care, treatment, or confinement of a patient.

Daneshfar's causes of action allege that the above facts demonstrate that Baylor breached its contract with him and that his termination constituted wrongful discharge under the contract, that Shutze should be liable for Baylor's wrongful discharge of him and for tortiously interfering with Daneshfar's contract with Baylor; that Baylor was negligent in supervising Shutze, the residency program, and the internal review process; that Baylor and Shutze owed him fiduciary duties which they breached, encouraged each other to breach, and that they conspired to breach; and that Baylor's and Shutze's actions constituted duress and intentional infliction of emotional distress. The underlying nature or essence of Daneshfar's claims is that of an employment or education dispute, not claims for negligent medical or health care. Even though the causes of action implicate Baylor's professional or administrative services, the record does not show that they directly relate to any patient's medical care, treatment, or confinement. Therefore, they are not health care liability claims.

**Safety**

Appellants also contend that Daneshfar's causes of action constitute health care liability claims because they allege a "departure from accepted standards of . . . safety." CIV. PRAC. § 74.001(a)(13) (definition of "health care liability claim"). "Safety" is not defined by the Act. However, the Texas Supreme Court has construed it to mean "the condition of being 'untouched by danger; not exposed to danger; secure from danger, harm or loss.'" *Tex. W. Oaks Hosp. v.*

–10–

*Williams*, 371 S.W.3d 171, 184 (Tex. 2012) (quoting *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 855 (Tex. 2005) (quoting *Safe* BLACK'S LAW DICTIONARY (6th ed. 1990))). The legislature intended a safety-standards-based claim to have "some relationship to the provision of health care other than the location of the occurrence, the status of the defendant, or both." *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 504 (Tex. 2015). A safety-standards-based claim does not have to be "directly related to health care" to be a health care liability claim, but there does have to be "a substantive nexus between the safety standards allegedly violated and the provision of health care." *Id.*; *see Tex. W. Oaks Hosp.*, 371 S.W.3d at 185, 186 ("directly related to health care" modifies only "professional or administrative services" and not "safety"). The supreme court suggested seven factors to consider in determining whether a safety-standards based claim is substantively related to the defendant's provision of medical or health care:

> 1. Did the alleged negligence of the defendant occur in the course of the defendant's performing tasks with the purpose of protecting patients from harm;
>
> 2. Did the injuries occur in a place where patients might be during the time they were receiving care, so that the obligation of the provider to protect persons who require special, medical care was implicated;
>
> 3. At the time of the injury was the claimant in the process of seeking or receiving health care;
>
> 4. At the time of the injury was the claimant providing or assisting in providing health care;
>
> 5. Is the alleged negligence based on safety standards arising from professional duties owed by the health care provider;
>
> 6. If an instrumentality was involved in the defendant's alleged negligence, was it a type used in providing health care; or
>
> 7. Did the alleged negligence occur in the course of the defendant's taking action or failing to take action necessary to comply with safety-related requirements set for health care providers by governmental or accrediting agencies?

*Ross*, 462 S.W.3d at 505.

We will apply each of these factors.  (1) Nothing shows appellants' alleged negligence occurred as the result of appellants' performing tasks with the purpose of protecting patients from harm.  Instead the acts concerned Daneshfar's poor relationship with his supervisor and mentor, Shutze.  (2) Although all the acts may have occurred in a hospital, nothing in the record shows appellants' acts occurred in front of patients.  Also, nothing in the record shows any of the alleged acts involved medical care as defined in section 74.001(a)(19).  (3) Daneshfar was not seeking or receiving health care at the time of the injury, that is, at the time of the verbal abuse and harassment, the failure to provide semi-annual reviews, his being placed on formal probation, his termination, and his failure to be heard and to be reinstated in the administrative review process.  (4) Nothing in the record shows Daneshfar was providing or assisting in providing health care when Shutze verbally abused him and refused to provide reviews.  The record shows he was not providing health care when he was placed on formal probation—he was in a meeting with Sutker that Shutze also attended.  Nothing in the record shows he was providing health care when he was notified of his termination or during the administrative review process.  (5) The actions were based on appellants' failure to comply with professional standards of behavior toward residents and supervising of residency programs; however, as discussed above, nothing in the record shows the alleged acts were directly related to health care.  (6) Daneshfar did not allege, and the record does not indicate, the use of any instrumentality other than Shutze's alleged manipulation of the review committees deciding to place Daneshfar on formal probation and later terminate him and Shutze's alleged manipulation of the administrative review process to block Daneshfar's reinstatement.  These instrumentalities are not "a type used in providing health care."  (7) Appellants' alleged wrongful acts did "occur in the course of the defendant's taking action or failing to take action necessary to comply with . . . requirements set for health care providers by . . . accrediting agencies."  However, those requirements concerned the residents' work and educational environment, the well-being of

the residents, and the relationship between residents and the employing hospital and residency program, the supervisor, and the teaching physicians. They were not "safety-related requirements" except to the extent that the residents worked with patients, and overworked or improperly educated resident could be unsafe. However, the requirements allegedly violated were not on their face safety related.

### Medical Care or Health Care

Appellants also contend that Daneshfar's causes of action are "for . . . departure from accepted standards of medical care, or health care." CIV. PRAC. § 74.001(a)(13) (definition of "health care liability claim").

Appellants quote the supreme court's statement, "a claim alleges a departure from accepted standards of health care if the act or omission complained of is an inseparable or integral part of the rendition of health care. '[T]raining and staffing policies and supervision and protection of [patients] . . . are integral components of a [health care facility's] rendition of health care services . . . .'" *Tex. W. Oaks Hosp.*, 371 S.W.3d at 180 (quoting *Diversicare*, 185 S.W.3d at 850). Appellants assert that because Daneshfar's claims assert violations of the ACGME requirements, which concern the training of residents, they must be health care liability claims. We disagree. *Texas West Oaks Hospital* involved a claim for the death of a mental-health patient at the hands of an employee of the mental-health hospital where the patient was admitted. The family sued the hospital and the employee, and the employee filed a cross claim against the hospital, alleging the hospital failed to properly train him to work at the hospital. *Id.* at 175. *Diversicare* concerned a nursing-home resident who sued the facility after she fell twice and was sexually assaulted by another resident. *Diversicare*, 185 S.W.3d at 845. She alleged the nursing home failed to train a sufficient number of staff and that it failed to implement adequate policies and procedures for safety, training, and staffing its nursing homes. *Id.* The supreme court concluded that the claims

–13–

in both cases were health care liability claims. *See Tex. W. Oaks Hosp.*, 371 S.W.3d at 174, 193; *Diversicare*, 185 S.W.3d at 845, 855. The allegations in both cases involved the care of patients, the failure to provide proper training for the employees performing health care on the injured patients, and injuries to the patients as a result of the inadequate care. *See Tex. W. Oaks Hosp.*, 371 S.W.3d at 175; *Diversicare*, 185 S.W.3d at 845. Both involved "acts or omissions" that were "an inseparable part of the rendition of medical services," *Diversicare*, 185 S.W.3d at 848, namely the medical services for the patients allegedly injured by the failure to train the institutions' employees. In this case, however, the wrongful acts and omissions Daneshfar alleged did not concern health or medical care that caused injury to any patients.[2] We conclude that even though Daneshfar's claims concern the conditions of his training, education, and employment in the health care industry, they are not health care liability claims when they do not concern the care of or an injury to a patient.

Appellants also contend that the decisions to place Daneshfar on probation and to terminate him were the decisions of peer review committees. Citing *Garland Community Hospital v. Rose*, 156 S.W.3d 541 (Tex. 2004), they assert the supreme court has "held the professional evaluation of physicians is a 'core function' of hospitals and medical facilities, and that this evaluation of physicians is 'an inseparable part of the health care rendered to patients.'" *Id.* at 545. In *Rose*, the plaintiff alleged she was disfigured in cosmetic surgeries performed at the hospital. *Id.* at 542. She alleged the hospital was negligent in granting credentials to the surgeon. *Id.* Although the plaintiff filed expert reports, the trial court determined they were insufficient, dismissed the claims

---

[2] Daneshfar's attorney sent a letter to Baylor's attorney, and he drafted a complaint to the ACGME that he sent to Baylor. Both documents described Daneshfar's grievances with Shutze and the residency program. One of the areas of complaint was whether the residency program complied with the ACGME requirement that a residency program "must demonstrate that the appropriate level of supervision is in place for all residents who care for patients." The attorney stated, "When DD [Daneshfar] called Dr. Shutze to come in and see a patient who required an emergent operation, Dr. Shutze would not accept DD's assessment and questioned the need to operate. This led to an adverse patient event." Both the letter and the complaint were attached to Daneshfar's petition and incorporated into it by reference. However, none of Daneshfar's causes of action involve the program's or Shutze's lack of supervision of residents or the failure to comply with that ACGME requirement. Nor does the body of the petition refer to any adverse patient event. We conclude that section of the letter and complaint is not relevant to Daneshfar's causes of action.

against the hospital, and severed them from her other claims. *Id.* at 543. The court of appeals reversed, concluding the negligent-credentialing claim was not a health care liability claim because the negligent acts or omissions in credentialing the surgeon did not occur during the plaintiff's medical care, treatment, or confinement. *Id.* at 544. The supreme court determined that "[t]he court of appeals' temporal distinction does not comport with the realities of the credentialing process." *Id.* The supreme court stated, "A patient's complaint about a credentialing decision is not directed solely to the hospital's *initial* decision to credential a physician, but also to the hospital's maintaining those privileges during the time of the patient's treatment . . . . Thus, a hospital's credentialing activities occur both before and *during* the treatment of a patient." *Id.* The court also stated, "A hospital's credentialing of doctors is necessary to that core function and is, therefore, an inseparable part of the health care rendered to patients." *Id.* at 545. The plaintiff alleged the hospital was negligent in credentialing the surgeon because there had been complaints from other patients. *Id.* at 542. Thus, her credentialing claim involved acts or omissions in the surgeon's medical treatment of patients, which is health care under section 74.001. Furthermore, her claim was expressly one for medical malpractice. In this case, however, nothing in the record shows the committees' decisions to place Daneshfar on probation and to terminate him from the program were based on acts or omissions in his medical treatment of patients. *Rose* does not show that Daneshfar's claims are health care liability claims.

Appellants also contend the causes of action are health care liability claims because expert medical or health care will be needed to prove and refute the claims. In *Texas West Oaks Hospital*, the supreme court stated, "we now hold that if expert medical or health care testimony is necessary to prove or refute the merits of the claim against a physician or health care provider, the claim is a health care liability claim." *Tex. W. Oaks Hosp.*, 371 S.W.3d at 182; *see Psychiatric Solutions, Inc. v. Palit*, 414 S.W.3d 724, 727 (Tex. 2013) (claims of psychiatric nurse injured while

–15–

restraining a patient were health care liability claims because his "suit claims that Mission Vista departed from the accepted standards of safety and health care, which requires the use of expert testimony to support or refute the allegations."). Appellants argue that expert testimony of physicians or other health care providers is necessary to determine whether Shutze and Baylor acted properly or improperly.

We agree that expert testimony by physicians or other health care providers will be necessary for the parties to prove whether Shutze and Baylor acted properly or improperly. As appellants stated in their motion to dismiss, "One cannot dispute the evaluation, handling and supervision of physicians participating in a vascular surgery fellowship is not something within the common knowledge of lay individuals." However, the questions are whether that expert testimony involves medical care or health care as defined in section 74.001 and whether that type of testimony is "require[d]" or "necessary." *See Psychiatric Solutions*, 414 S.W.3d at 727; *Tex. W. Oaks Hosp.*, 371 S.W.3d at 182. Not all expert testimony that a physician might present involves medical care or health care as defined in section 74.001. Testimony about medical care must concern "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions." OCC. § 151.002(13). Testimony about health care must concern an "act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." CIV. PRAC. § 74.001(a)(10). Both definitions require the testimony concern the treatment of a patient.

Although appellants asserted that such testimony will be necessary, they did not explain to the trial court why it will be necessary. Even though the expert testimony of a physician might be necessary to explain why the facts Daneshfar alleged were or were not appropriate by Baylor and

–16–

Shutze, nothing in the record shows such testimony will necessarily require testimony about medical care or heath care, that is, testimony about acts or omissions in the diagnosis or treatment of a patient. As for whether medical care or health care testimony will be necessary or required to prove appellants' defense that Daneshfar was not competent in the program, appellants did not explain to the trial court what evidence would be necessary. The record contains the letter placing Daneshfar on formal probation, which stated, "Among the areas in which you have shown deficiencies are: technical and surgical skills, clinical knowledge, attention to detail, time management and organization." Although testimony about any of these areas could conceivably involve testimony about medical care or health care as defined in section 74.001, the record does not show that such testimony will be "necessary" or "require[d]." Nothing in the record shows proof of Daneshfar's competence or lack of competence will necessarily require evidence about acts or omissions in the diagnosis or treatment of patients.

## CONCLUSION

The essence and underlying nature of Daneshfar's claims are that they are those of a former employee who alleges he was mistreated in the workplace and believes he was wrongfully terminated. Because of the dual employment/teaching nature of the residency program, the claims' essence and underlying nature are also those of a former student claiming he was not provided an appropriate environment to learn and was wrongfully terminated from the education program. The supreme court has stated that "the Legislature did not intend for the expert report requirement to apply to every claim for conduct that occurs in a health care context." *Ross*, 462 S.W.3d at 502. Daneshfar's employment- and education-based causes of action are not the types of claims the legislature intended the protections of the Texas Medical Liability Act to apply.[3]

---

[3] There are numerous Texas cases where doctors terminated from hospital residency programs have sued for wrongful termination. None of the opinions show that the defendant hospitals and physicians in those cases asserted the terminated-doctors' claims were health care liability claims requiring service of expert reports. *See Univ. of Tex. Health Sci. Ctr. at Tyler v. Nawab*, 528 S.W.3d 631 (Tex. App.—Texarkana Apr. 21, 2017,

We conclude the record does not show that Daneshfar's claims are health care liability claims. Therefore, he is not a claimant as defined by the Act, and he is not subject to the expert-report requirement of section 74.351(a). We overrule appellants' issue on appeal.[4]

We affirm the trial court's order denying appellants' motion to dismiss.


/Lana Myers/
LANA MYERS
JUSTICE


170181HF.P05

---

pet. denied); *Tex. Tech Univ. Health Scis. Ctr. v. Enoh*, No. 08-15-00257-CV, 2016 WL 7230397 (Tex. App.—El Paso 2016, no pet.); *Swate v. Tex. Tech. Univ.*, No. 03-98-00227-CV, 1999 WL 106718 (Tex. App.—Austin Mar. 4, 1999, no pet.) (not designated for publication); *Brown v. Univ. of Tex. Health Ctr. at Tyler*, 957 S.W.2d 911 (Tex. App.—Tyler 1997, no pet.); *see also Rose v. Univ. of Tex. Sw. Med. Sch. at Dallas*, No. 01-10544, 32 Fed. Appx. 131, 2002 WL 335277 (5th Cir. Feb. 22, 2002) (per curiam); *Shaboon v. Duncan*, 252 F.3d 722 (5th Cir. 2001); *Karagounis v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 168 F.3d 485, 1999 WL 25015 (5th Cir. 1999) (per curiam); *Shah v. Univ. of Tex. Sys., Med. Found.*, No. 97-20775, 156 F.3d 182, 1998 WL 546475 (5th Cir. Aug. 7, 1998) (per curiam); *Simmons v. Jackson*, No. 3:15-CV-1700-D, 2017 WL 3051484 (N.D. Tex. July 9, 2017); *Refaei v. McHugh*, No. 14-51148, 624 Fed. Appx. 142 (5th Cir. June 11, 2015); *Beltran v. Univ. of Tex. Health Sci. Ctr. at Houston*, 837 F. Supp. 2d 635 (S.D. Tex. 2011); *Sayibu v. Univ. of Tex. Sw. Med. Ctr. at Dallas*, No. 3:09-CV-1244-B, 2010 WL 4780732 (N.D. Tex. Nov. 22, 2010); *Nagm v. Univ. of Tex. Health Sci. Ctr. at Houston*, No. Civ.A. H-04-2132, 2005 WL 1185801 (S.D. Tex. May 11, 2005).

[4] Our decision concerns only whether the record shows Daneshfar's suit was subject to the expert-report requirement of section 74.351. We make no determination concerning the merits of Daneshfar's claims.



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

BAYLOR UNIVERSITY MEDICAL
CENTER, INC., BAYLOR SCOTT &
WHITE HEALTH; BSW HEALTH
SERVICES AND WILLIAM P. SHUTZE,
M.D., Appellants

No. 05-17-00181-CV     V.

BAHRAUM DANIEL DANESHFAR,
M.D., Appellee

On Appeal from the 191st Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-15-11793.
Opinion delivered by Justice Myers.
Justices Francis and Whitehill participating.

This Court's judgment of November 17, 2017 is **VACATED**. The following is now the judgment of this Court.

In accordance with this Court's opinion of this date, the order of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee BAHRAUM DANIEL DANESHFAR, M.D. recover his costs of this appeal from appellants BAYLOR UNIVERSITY MEDICAL CENTER, INC., BAYLOR SCOTT & WHITE HEALTH; BSW HEALTH SERVICES AND WILLIAM P. SHUTZE, M.D.

Judgment entered this 12th day of February, 2018.